**IN THE UNITED STATES COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **LORI WASHINGTON, ex rel.  J.W.** | § | |
| **Plaintiffs,** | § | |
| **v.** | § | |
| | § | |
| **KATY INDEPENDENT** | § | **Civil Action No.  4:18-CV-01848** |
| **SCHOOL DISTRICT AND OFFICER** | § | |
| **ELVIN PALEY, INDIVIDUALLY** | § | |
| **Defendant.** | § | |

## FIRST AMENDED COMPLAINT

**NOW COMES** Lori Washington natural mother of and on behalf of her son J.W., who executed a valid power of attorney for her to represent him as Attorney-In-Fact (collectively "Plaintiffs" herein), and files this their *First Amended Complaint* alleging that the Katy Independent School District (hereinafter referred to as "KISD" or the "School District") and School Resource Officer ("SRO") Elvin Paley, Individually, violated the various rights of J.W. as more specifically pled herein. Plaintiffs reserve the right to re-plead if new claims and issues arise upon further development of the facts as permitted by law. In support thereof, Plaintiffs would respectfully show this tribunal the following:

## I. INTRODUCTION AND BRIEF REVIEW OF THE CASE

1.    Nationwide, data collected by our Office for Civil Rights show that youths of color and youths with disabilities are disproportionately impacted by disciplinary measures. For example, data show that African-American students with disabilities are more than three times as likely as their white peers without disabilities to be expelled or suspended. Although students who receive special education services represent 12 percent of students in the country, they make up 19 percent of students suspended in school, 20

percent of students receiving out-of-school suspension once, 25 percent of students receiving multiple out-of-school suspensions, 19 percent of students expelled, 23 percent of students referred to law enforcement, and 23 percent of students receiving a school-related arrest.

2.      At the time of the incident upon which this cause of action vests, J.W. was a 17 year old student attending the Mayde Creek High School within the Katy Independent School District. J.W. is of African-American heritage and has an intellectual disability, formerly known as mental retardation.

3.      On or about November 30, 2016, J.W. was in the midst of an emotional breakdown and anxiety attack. He wanted to leave the school and walk around to help calm himself down, but school officials, including and especially School Resource Officer Paley, would not let him do so.

4.      Even though School Board policies and procedures merely give authority to school officials to use detention restraint in limited circumstances, and rather give an offending student who leaves campus a disciplinary infraction citation, SRO Paley restrained J.W. unnecessarily and tased[1] him excessively, even though J.W. was not a danger to himself or others.

5.      Due to the issues noted above and more fully described below, J.W. brings forth claims

---

[1]. "Tasers" are hand-held devices that shoot darts into clothing and flesh. An electric charge flows from the taser into the darts (or "probes") through connecting wires, and then into the body Alternatively, a law enforcement officer can remove the dart cartridge and apply the laser directly to the body to administer what is called a "drive stun". Whether delivered by drive stun or by probes, the electric current affects the central nervous system and causes immediate, but temporary immobilization.

First Amended Complaint                                                                                  2

pursuant to the *Section 504 Of The Rehabilitation Act of 1973*, 29 U.S.C. §794 ("Section 504"), and the *Americans with Disabilities Act*, 42 U.S.C. 12100 et seq. (ADA"); the Fourth Amendment to the Constitution of the United States, as well as the *Due Process Clause* and *Equal Protection Clause* of the Fourteenth Amendment, all as contemplated by the Civil Rights Acts, 42 U.S.C. §1983.

## II. <u>PROCEDURAL RESUME</u>

6.    As noted throughout this pleading J.W. is a person with a disability. At all times pertinent to this lawsuit, he received special education services from the Katy ISD, as contemplated by *Individuals With Disabilities Education Act* ("IDEA"), 20 U.S.C. §1401 et seq.

7.    In regard to concerns leading up to the incident made the basis of this cause of action, the incident itself and the School District's failure to remedy any of the injuries J.W. sustained at the hands of Defendant Paley and others, or about December 4, 2017, he filed a complaint with the Texas Education Agency ("TEA"), pursuant to 20 U.S.C. §1415(b)(7); 19 T.A.C. §89.1165. In that *Petition* he asks that the TEA appoint a Hearing Officer ("HO") to address these and other concerns.

8.    In that "Petition" he included causes of action not only pursuant to the IDEA but also claims pursuant to *Section 504 Of The Rehabilitation Act of 1973* the *Americans with Disabilities Act* and constitutional claims pursuant to Section 1983 of the Civil Rights Acts of 1964.

9.    On or about December 15, 2017, the School District filed their *Initial Response To Petitioners Due Process Hearing Complaint And Prior Written Notice* ("the Response").

In that writing the Defendant School District filed a *Plea To The Jurisdiction* asking the HO to dismiss all the non-IDEA claims including those pertaining to Section 504, the ADA and Constitutional claims, as a TEA HO does not have jurisdiction over such claims.

10.    On or about February 15, 2018, a Pre-Hearing Conference was convened and the Hearing Officer issued an *Order* dismissing all non-IDEA claims for want of jurisdiction.

### III. JURISDICTION

11.    Jurisdiction is conferred upon the Court pursuant to 28 U.S.C.A. §1331 and §1343 because the matters in controversy arise under the Constitution, laws and rules of the United States as noted herein.

12.    Jurisdiction is also conferred upon the Court pursuant to 28 U.S.C.A. §1415(l) as J.W. has satisfied the exhaustion requirements for his non-IDEA claims, as contemplated by Reyes v. Manor Independent School District, 850 F.3d 251, 256 (5th Cir. 2017) [finding when Hearing Officer gives a "finding and decision" on non-IDEA claims, as has occurred in this cause, exhaustion requirement is satisfied].

### IV. VENUE

13.    Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiff's claims occurred in the Southern District of Texas, Houston Division.

### V. PARTIES

14.    J.W. lives with his mother, Lori Washington. Currently, J.W. and Ms. Washington are displaced and living with a friend due to Hurricane Harvey damaging their home.

However, during the incident, they lived at 4607 Hickory Downs Drive, Houston, Texas 77084, within the KISD catchment area. On or about November 22, 2017, J.W. executed a valid power of attorney giving Lori Washington standing to bring this *First Original Complaint* on behalf of J.W.

15.    The Katy Independent School District is a school district organized under the laws of the State of Texas. At all times pertinent to this case, J.W. was a student at the Katy Independent School District. KISD has been served and has answered by and through its Counsel of record, the Honorable Mr. Christopher B. Gilbert and Ms. Hailey R. Janecka,, Attorneys & Counselors At Law with the Law Firm of Thompson & Horton LLP, 3200 Southwest Freeway, Suite 2000, Houston, Texas 77027.

16.    Officer Elvin Paley is a School Resource Officer for the Katy Independent School District and has been served and has answered by and through its Counsel of record, the Honorable Mr. Christopher B. Gilbert and Ms. Hailey R. Janecka,, Attorneys & Counselors At Law with the Law Firm of Thompson & Horton LLP, 3200 Southwest Freeway, Suite 2000, Houston, Texas 77027.

## VI.  STATEMENT OF FACTS

A.    ABOUT SCHOOL RESOURCE OFFICERS

17.    Though the school resource officer (SRO) program in the United States is more than sixty years old, the program did not gain prominence until the 1990s in response to various school shootings. According to national data, SRO's can be found in approximately 35 percent of schools across America, regardless of level (elementary, middle, or high school); whether the location of the school is a rural town, suburban area,

or city; or enrollment size. They are embedded within the school to assist school administration with anything that might involve a criminal law component such as the presence of a firearm on campus.

18. At many schools, an SRO's role is clearly defined and the officer engages with students strictly as part of a community policing project but does not interfere with or have any role in administrative discipline. The KISD police department was founded in 1988 to protect the students, staff, and visitors to KISD campuses and properties..

B.    KATY ISD POLICIES AND PROCEDURES

19. Katy ISD claims to adhere to the state's policy to treat all students, including those with disabilities, with dignity and respect.

20. Any discipline that is administered to students has to be done with the student's safety as the priority.

21. This means that district staff are not permitted to use discipline as a way to harm, demean, or deprive students of basic human necessities. *Education Code 37.0021(a); 19 TAC 89.1053(j)*

22. The standards, mentioned above, for discipline apply to all district staff, including peace officers who are either employed/commissioned by a school district or who provide a regular police presence on a school district campus under a memorandum of understanding between the district and a local law enforcement agency. *Education Code 37.0021(h); 19 TAC 89.1053(l)*

23. One way to discipline is by using restraints.

24. A "restraint" is the use of physical force or a mechanical device to significantly restrict

free movement of all or a portion of a student's body.

25.  There are procedures that must be followed by any school district staff administering a restraint on a student.

26.  Restraints should only be used in an emergency. An "emergency" is a situation in which a student's behavior poses a threat of imminent, serious physical harm to student others, or property destruction. *19 TAC 89.1053(b)(1)-(2)*.

27.  Additionally, a restraint should be limited to the amount of force necessary to address the situation.

28.  When the emergency ends, the restraint must end.

29.  Also, as mentioned above, the restraint must be administered with the student's health, safety, and basic necessities in mind and as priority. *19 TAC 89.1053*

30.  Another KISD policy is that any student who leaves campus during lunch or any other time without administrative approval will receive *disciplinary action* as specified in the Student Code of Conduct. *FEE (LOCAL)*. The *Discipline Management Plan and Student Code of Conduct* for Katy ISD states that any student who leaves campus without parental and administrative permission will be considered truant.

C.   ABOUT J.W.

31.  J.W.  was born in 1999. He is now eighteen years old.

32.  During a significant period of time that makes the basis of this complaint, he was a student at Mayde Creek High School in the Katy Independent School District. J.W.  has been diagnosed by KISD with an intellectual disability (*a/k/a mental retardation)* and an emotional disturbance. His mental and behavioral disabilities affect his daily functioning,

including his ability to communicate, control his emotions, and access regular educational services without accommodations. For all purposes of this lawsuit, he is considered a person with a disability.

33.    J.W. communicates well when he is calm. As he was incessantly bullied by other students over the years while a student at KISD, he often becomes upset and is unable to effectively communicate his needs when harassed by other students. Because of J.W. 's limitations, he is easily victimized at the hands of other students.

D.    THE INCIDENT

34.    On November 30, 2016, J.W. was upset due to being bullied and harassed by another male student in his special-needs classroom. The student called him names including "stupid," "idiot" and "retarded."

35.    Staff close to J.W. knew that when he was bullied and harassed it would often, and not surprisingly, act as *trigger* for him and cause him to react emotionally.

36.    Staff close to J.W. also knew that when he reacted emotionally he would like to be by himself.

37.    In addition, they also knew one way he would calm himself down was by "walking it off."

38.    Both of these were successful accommodations and modifications to his  educational environment to address his emotional needs.

39.    In order to calm himself down, J.W. attempted to retreat to a "safe space" or "chill out room" and take a break.

40.    This too was an accommodation and modification to the environment made available to

J.W. to address his emotional and behavioral disabilities.

41.    When J.W. was distressed, he often would go to this "chill out room." As noted above, it was well-known that he would also pace around the room and talk to himself out loud, in order to calm himself down.

42.    However on the day of the incident, there was another male student already in the "chill out room" which caused J.W. to leave. He found the hallway and started to walk towards a door leading to a breeze way between buildings on the campus.

43.    Without reason J.W. was stopped at the door, an atrium like area, by one school official.

44.    Another school official stood on the far left side of the atrium, loosely blocking the doors on that side of the area, as well. There was soon a female officer in the area.

45.    Officer Paley is notified and he and a female school official walk to the area.

46.    J.W. is in telling the male school official in front of the door "this is making it worse," over and over (and over and over).

47.    At approximately 12:43:30 J.W. states "Let me go...so I can cool down".

48.    The school officials continue (and continue) to ask J.W. the same questions (over and over) about why he wanted to leave the school building. J.W. continues to pace, over and over. Not surprisingly, his fear and anxiety worsened.

49.    At this point, at 12:45:54 J.W. calmly walks towards the door nearest him and attempts to go outside. He put his hand on the door and did not touch anyone at all.

50.    Nevertheless, the male official closest to J.W. initiated physical contact with J.W. and for no apparent reason attempted to block him from exiting the building.

51.    Officer Paley then briskly walked towards J.W. and at 12:46:01 Officer Paley's body

camera goes dark.

52. Almost immediately the female staff member in the hall yells out "Stop" but Paley does not."

53. He starts to tase J.W. Staff members is heard telling Officer Paley to "cut it out, let him go."

54. All the while, J.W. is screaming for help. He begs them asking "what are you doing?"

55. Officer Paley asserts in the midst of the chaos "hey, you are NOT gonna get through that door, just relax." J.W. cries out in pain again.

56. J.W. turns his back. Paley uses the taser. J.W. cries out again, this time from the pain of the taser.

57. J.W. falls to the ground, yet Officer Paley still feels the need to shout at him to "GET DOWN!" Officer Paley continues to tase J.W. as he falls to the ground.

58. J.W. falls face first and with his stomach facing the ground. Then, he rolls over onto his back, then stomach again, still screaming, screeching, and writhing in pain.

59. When J.W. is back on his stomach, Officer Paley commands him, "put your hands behind your back."

60. J.W. indicates to Officer Paley that he was unable to do so. The taser is still on him and still shocking him. Officer Paley continued to shoot J.W. with his taser gun approximately six to eight times. Approximately one minute after the female staff member told SRO Paley to stop.

61. The female officer tells J.W. to put his hands behind his back but J.W. is not able to comply.

First Amended Complaint                                                                                   10

62.  Officer Paley repeats the command a third time, and this time J.W. is able to comply. He stops screaming.

63.  J.W. sits still, no longer screaming, but his breathing is heavy and labored. As a result of the tasing, J.W. urinated and defecated on himself.

64.  In this silence and in this very vulnerable state Officer Paley continues to shout at J.W. "Don't you move," though J.W. has not moved since the first time he was told to put his hands behind his back.

65.  Officer Paley stands up and the female officer puts handcuffs on J.W. The female officer struggles with the handcuffs a little, and other staff and SRO Paley come closer to help her.

66.  As the handcuffs are being put on J.W., Officer Paley screams at J.W. "I did not want to tase you, but you don't run s*** here" all while pointing the taser gun at J.W.'s head with the taser gun laser light on J.W.'s forehead.

67.  Despite being in handcuffs, J.W. was never provided the *Miranda* warning or told he was under arrest.

68.  However, J.W. was under the clear and reasonable impression that he was under arrest.

69.  J.W. was so scared he began screaming that he could not breathe.

70.  Despite his cries, and instead of asking J.W. what was comfortable for him, the officers continued to move J.W. onto his side. His breathing speed audibly increased. His legs were shaky and numb. He was wet and dirty.

71.  Still having problems breathing, J.W. stated he was afraid that he was going to die.

72.  Finally, the officers and school officials sit J.W. upright. As he leans against Officer

Paley's leg, J.W. takes a big gulp of air. He then became nauseated and began gagging.

73.    A school nurse is finally called. When she arrives she assesses J.W.

74.    *Emergency medical services* (EMS) was finally called.

75.    One female school official announced that she would call J.W.'s mother, but Officer Paley stopped her.

76.    He explicitly said that protocol was to call EMS, have them assess J.W. before calling his mother.

77.    The female officer affirmed.

78.    Paramedics came to the school to assess J.W.

79.    They remove the taser prongs.

80.    The first question one female paramedic asked when she arrived is whether or not J.W.'s mother had been called.

81.    She had not.

82.    The female paramedic informed the school officials that they should have contacted his mother immediately.

83.    The other paramedics worked on removing the prongs from the taser. One prong easily came off of J.W.'s body, but the other prong was embedded into his body near his right rib cage.

84.    J.W., drifting in and out of consciousness, cried out in pain again when the paramedics took out the taser prong that penetrated into his body.

85.    KISD finally called Ms. Washington.

86.    Ms. Washington contacted EMS to meet her at the school to assess J.W.

87. Because she was provided very little information, Ms. Washington was unaware that EMS had already been to the school to assess J.W..

88. After Ms. Washington arrived at the school, she was taken to offices in the back where J.W. was visibly upset and shaking—obviously traumatized.

89. J.W. was given clothing to change into rather than being taken to a bathroom where he could change in private, he was forced to change clothes in a room with Officer Paley and others watching him.

90. J.W. was still under the impression that he was under arrest.

91. Ms. Washington was very concerned about J.W. 's health and well-being, and had him transported by ambulance to the hospital.

92. During the entire ordeal and through the present, despite her repeated inquiries, KISD staff has never told Ms. Washington what happened that day and why J.W. was tased.

E.     AFTER THE INCIDENT

93. After the incident, Ms. Washington was forced to keep J.W. home due to fear for his safety while at school.

94. J.W.'s private medical providers supported this decision.

95. Despite Ms. Washington's repeated requests for a meeting to discuss the incident and J.W. 's special education services, KISD staff did not schedule any meeting until April 24, 2017.

96. KISD abruptly cancelled the meeting because Ms. Washington showed up with her attorney.

97. Despite availability and multiple requests for rescheduling KISD took approximately

another month to convene a meeting, which finally took place on May 22, 2017— *almost six months after the incident*.

98.   At the meeting, KISD staff again refused Ms. Washington's requests to discuss the incident and would not answer her questions regarding the same.

99.   KISD staff told Ms. Washington that the meeting that day was not the appropriate time to discuss the incident, and that they would schedule a meeting to discuss the incident.

100.  Ms. Washington requested that the parties schedule the meeting that day, but KISD staff refused.

101.  KISD staff never scheduled the promised meeting to discuss the incident and continued to refuse Ms. Washington's requests to do so.

102.  J.W. was the victim of unnecessary detention and restraint by KISD officials.

103.  Such detention and restraint was excessive.

104.  J.W. was the victim of unnecessary detention and restraint by SRO Paley.

105.  Such detention and restraint was excessive.

106.  J.W. was unnecessarily tased by SRO Paley.

107.  The tasing of J.W. was an unreasonable use of force.

108.  J.W. was unnecessarily handcuffed by SRO Paley.

109.  The tasing of J.W. was an unreasonable use of force.

110.  The detention, restraint, tasing and handcuffing by Officer Paley on J.W. was clearly excessive, was done with personal animus, and in a purposeful effort to cause J.W. pain.

111.  When Officer Paley forced J.W. to change his clothing, after urinating and defecating in them, in public- was an affront upon J.W.'s personal dignity.

First Amended Complaint                                                                            14

F.    THE EFFECT OF THE INCIDENT ON J.W.

112.    After the incident, J.W. had to receive emergency medical treatment.

113.    J.W. suffers from intense anxiety due to the incident.

114.    Due to fear for his safety, Ms. Washington kept J.W. home from school, causing him to miss school and educational benefit for approximately six months, educational services that his non-disabled peers received.

115.    J.W. was traumatized by the experience. He lost his trust for police officers, is even scared of them, and he has nightmares about police officers hurting him.

G.    THE DISTRICT HAS FAILED TO REMEDY THE EFFECTS OF THE INJURY

116.    The District failed to remedy the effects of the injuries J.W. sustained at all, whether such remedies are otherwise required pursuant to caselaw, evolving jurisprudence, executive agency directives whether from federal or state entities or the District's own policies and procedures.

## VII.  STATE ACTION

117.    Plaintiffs incorporate by reference all the above-related paragraphs, as well as those below, with the same force and effect as if herein set forth.

118.    The KISD Defendants, in an Official and Individual Capacities and in all matters, were acting under color of state law when they subjected J.W. to the wrongs and injuries set forth herein.

## VIII. UNCONSTITUTIONAL POLICIES, PROCEDURES, PRACTICES, & CUSTOMS

119.    Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

120.    Plaintiffs contend that the failure of KISD to have policies, procedures, practices, and customs in place to protect J.W. from the very same professional staff intended to keep him safe, violated his rights pursuant to the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

121.    During the relevant time period contemplated by this cause of action, KISD by and through their designee, Officer Paley, had an actual policy, practice and custom of conscious and deliberate indifference to federal law, federal and state administrative directives, and KISD policies and procedures in regard to the treatment of J.W. , and such failures were the moving force behind the injuries to J.W. for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

122.    In addition, Plaintiffs contend that the failure of the Katy ISD Defendants to sufficiently *train* staff violates the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. § 1983.

123.    In addition, Plaintiffs contend that the failure of the Katy ISD Defendants to sufficiently *supervise* staff violates the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. § 1983.

## IX.  VIOLATIONS OF THE 4TH AMENDMENT TO THE U.S. CONSTITUTION

124.    Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

125.    At all times pertinent hereto, Defendant SRO Paley was acting in his capacity as an employee for the Defendant School District, and therefore acting under the color of the law.

126.   His actions and omissions which caused J.W.'s Constitutional deprivations are thus enforceable pursuant to 42 U.S.C. §1983.

127.   The restraint of J.W. by Defendant Paley was unreasonable.

128.   The restraint of J.W. by Defendant Paley was unnecessary.

129.   The restraint of J.W. by Defendant Paley was excessive.

130.   The tasing and force used on J.W. by Defendant Paley was unreasonable.

131.   The tasing and force used on J.W. by Defendant Paley unnecessary.

132.   The tasing and force used on J.W. by Defendant Paley was excessive.

133.   The handcuffing of J.W. by Defendant Paley was unreasonable.

134.   The handcuffing of J.W. by Defendant Paley unnecessary.

135.   The handcuffing of J.W. by Defendant Paley was excessive.

136.   As such, all these acts by Defendant Paley violated the rights of J.W. pursuant to the Fourth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

## X.  PLAINTIFF'S CONSTITUTIONAL RIGHT TO BODILY INTEGRITY

137.   Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

138.   At all times reelvant, Defendant SRO Paley was acting in his capacity as an employee for the Defendant School District, and therefore acting under the color of the law.  His actions and omissions which caused J.W.'s Constitutional deprivations are thus enforceable pursuant to 42 U.S.C. §1983..

139.   Specifically, and at all times relevant hereto, J.W. possessed both a substantive and

procedural *Due Process* right including, but not limited to, a liberty interest in his bodily integrity.

140.    Specifically, and at all times relevant hereto, J.W. possessed both a substantive and procedural *Due Process* right including, but not limited to, a privacy interest in his bodily integrity.

141.    Specifically, and at all times relevant hereto, J.W. possessed both a substantive and procedural *Due Process* right including, but not limited to, a dignity interest.

142.    The acts and omissions of Defendant Paley were deliberately indifferent to the overall health, safety and welfare of J.W. and his bodily integrity, and deprived him of this constitutional rights to privacy and dignity thereby.

### XI.  CLAIMS PURSUANT TO THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

143.    Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

144.    The acts and omissions of Defendant Paley singularly discriminated against J.W.  when treating him in a disparate manner as compared to other students similarly situated, thereby violating his rights pursuant to the *Equal Protection Clause* of the Fourteenth Amendment, for which for which J.W. seeks recovery pursuant to 42 U.S.C. §1983 and 1988.

### XII.  PLAINTIFFS CONSTITUTIONAL RIGHT TO AN EDUCATION

145.    Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

146.    The actions or inactions of Defendant Paley also violated J.W.'s rights under the

First Amended Complaint                                                                                              18

Constitution of Texas and the Constitution of United States as to a free and proper education.

147.    Under Article 1, Sections 3 and 4 of the Texas Constitution, it is stated:

All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services. Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin.

148.    Further, Under Article 1, Sections 3 and 4 of the Texas Constitution, it also is stated:

"A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."

149.    Under the 14th Amendment of the Constitution of the United States is states:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any Sate deprive any person of life, liberty, or property, without the due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

150.    Accordingly, J.W. possesses a property interest in his education.

151.    The aforesaid Defendant Paley willfully disregarded J.W.'s protected property interest in his education as guaranteed by both the Constitution of the United States and the Constitution of Texas in the manners and particulars noted above.

152.    As a direct and proximate result of the Defendant's unconstitutional acts, J.W. sustained a deprivation of constitutionally protected educational opportunities otherwise afforded non-disabled students.

## XIII. CLAIMS RELATED TO THE REHABILITATION ACT OF 1973

153. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

154. KISD receives federal funds and thus follow the requisites of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

155. The implemented regulations of Section 504 require that each state that receives disbursements, including the state's political subdivisions such as the local school districts, must ensure all students with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled student's needs, and fails to accommodate that child's disability and keep the student safe, it violates Section 504.

156. Plaintiffs assert that because KISD failed to provide the student a safe and non-hostile educational environment, such failures as noted above, have together and separately, contributed to violating J.W.'s rights pursuant to Section 504 and the federal rules and regulations promulgated pursuant thereto.

157. In addition, and separate and apart from his ADA cause of action noted below, J.W. alleges that KISD failed and refused to permit him to leave the campus as they would have otherwise permitted a non-disabled student to do, solely because of his disability.

158. As such, J.W. has a private cause of action for violation of the regulations promulgated under Section 504 due to the acts and omissions by KISD.

159. In addition and in the alternative, the failures denoted herein by KISD were a gross deviation from professional standards of care.

160. In addition and in the alternative, J.W. was a victim of intentional discrimination by

KISD.

161.   In addition and in the alternative, J.W. was a victim of disparate impact under Section 504 due to the acts and omissions of KISD.

162.   The acts and omissions of KISD specifically undermined and interfered with J.W. 's rights pursuant to Section 504, and he was a victim of discrimination based upon disability.

### XIV.  CLAIMS RELATED TO THE AMERICANS WITH DISABILITIES ACT

163.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

164.   In addition and in the alternative to the above, the facts as previously described demonstrate violations of Title II of the *Americans with Disabilities Act*, 42 U.S.C. §12131, *et seq.* ("ADA").

165.   J.W. is a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2).

166.   KISD is a "public entity" as defined in 42 U.S.C.  §12131(1), and receives federal financial assistance so as to be covered by the mandate of the ADA.

167.   KISD and its schools are facilities and their operation constitutes a program and services for ADA purposes.

168.   Specifically, and separate and apart from his Section 504 cause of action, J.W. alleges that KISD failed and refused to reasonably accommodate and modify services to him, in violation of Title II of the ADA.

169.   In addition, and separate and apart from his Section 504 cause of action, J.W. alleges that KISD failed and refused to permit him to leave the campus as they would have

otherwise permitted a non-disabled student to do.

170.    J.W. was a victim of discrimination based upon disability by the acts and omissions of KISD.

171.    J.W. has a private cause of action against KISD for their failure to follow relevant regulations promulgated pursuant to the ADA.

172.    Such failures caused injuries to J.W.

## XV. RATIFICATION

173.    Plaintiffs incorporate by reference all the above-related paragraphs, as well as those below, with the same force and effect as if herein set forth.

174.    KISD ratified the acts, omissions, and customs of Officer Paley and the KISD Police Department personnel and staff.

175.    KISD Police Department ratified the acts, omissions, and customs of their personnel and staff.

176.    As a result, KISD is responsible for the acts and omissions of staff who were otherwise responsible for the safety of J.W.

## XVI. PROXIMATE CAUSE

177.    Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

178.    All of the foregoing acts and omissions of KISD, both separately and/or collectively, jointly and severally, whether in any official or individual capacity, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XVI. SPOLIATION

179.   Plaintiffs hereby require and demand that KISD preserve and maintain all evidence pertaining to any claim or defense related to the assault or other violations made the basis of this Complaint and request for due process or the damages resulting therefrom, including statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence regarding the incident or other violations set forth herein.

180.   Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use fo the spoliation inference rule– an inference or presumption that any negligent or intentional destruction of evidence of evidence was done because the evidence was unfavorable to the spoliator's case.

181.   As set forth in more detail herein above, KISD has been on notice of its duty to preserve the video recording of the incident.

## XVII.  <u>DAMAGES</u>

182.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

183.   As a direct and proximate result of KISD's conduct, J.W.  suffered injuries and damages, for which he is entitled to recover herein including but not limited to:

a.     Loss of educational opportunities to the same extent as a non-disabled student;

b.     Physical pain in the past;

c.     Medical expenses in the past;

d.     Medical expended in the future;

e.      Mental anguish in the past;

f.      Mental anguish in the future;

g.      Mental health expenses in the past;

h.       Mental health expenses in the future;

i.      Physical impairment in the past;

j.      Physical impairment in the future;

k.      Loss of earnings capabilities, and

l.      Various out-of-pocket expenses incurred by his family but for the acts and omissions of KISD.

## XVIII. <u>PUNITIVE DAMAGES</u>

184.   Plaintiffs incorporate by reference all the above-related paragraphs, as well as those below, with the same force and effect as if herein set forth.

185.   Plaintiffs reasonably believe the acts and omissions of Defendant Paley satisfy criteria for violation of civil rights and discrimination because the facts shock the conscience, this satisfying criteria for punitive damages, as contemplated by Section 1983.

## XIX. <u>ATTORNEY FEES</u>

186.   Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth herein.

187.   It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to 42 U.S.C. §1983, 1988(b) and 42 U.S.C. § 2000 et seq.

## XX. <u>DEMAND FOR JURY TRIAL</u>

188.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## XXI. <u>PRAYER</u>

Plaintiffs pray for judgment against KISD and Defendant Paley in the manner and particulars noted above, jointly and severally, and in an amount sufficient to fully compensate them for the elements of damages enumerated above, judgment for damages, recovery of attorneys' fees and costs for the preparation and trial of this cause of action, and for its appeal if required, Section 504, the ADA, 42 U.S.C. §1983 and 1988; and 42 U.S.C. §2000d et seq.; together with pre- and post-judgment interest, and court costs expended herein, as well as the equitable issues noted above; and for such other relief as this tribunal in equity, deems just and proper and for such other relief as the tribunal may deem just and proper in law or in equity.

Respectfully submitted,

<u>/s/ Martin J. Cirkiel</u>
Martin J. Cirkiel, Attorney
State Bar No.: 00783829
So. Dist. No.  21488
marty@cirkielaw.com [Email]

Holly Griffith Terrell, *Of Counsel*
State Bar No. 24050691
holly@cirkielaw.com [Email]

Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas  78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]

Drew Willey, Attorney
State Bar No.: 24093371
Drew Willey Law
1520 Rutland Street

Houston, Texas 77008
(713) 739-9455 [Telephone]
(713) 510-1950 [Facsimile]
drew@law-dw.com [Email]

**ATTORNEYS FOR PLAINTIFFS**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served upon all counsel of record listed below through the Court's ECF filing system and/or fax on this the 18th day of September 2018.

Mr. Christopher B. Gilbert, Attorney & Counselor At Law
State Bar. No. 00787535
So. Dist. No. 17283
cgilbert@thompsonhorton.com  [Email]; and

Ms. Hailey R. Janecka, Attorney & Counselor At Law
State Bar. No. 24099491
So. Dist. No. 3151241
hjanecka@thompsonhorton.com [Email]

Thompson & Horton LLP
3200 Southwest Freeway
Suite 2000
Houston, TX 77027
(713) 554-6744 [Telephone]
(713) 583-7698 [Facsimile]
Attorneys For Katy Independent School District And Elvin Paley

/s/ Martin J. Cirkiel
Martin J. Cirkiel