United States District Court
Southern District of Texas
**ENTERED**
June 05, 2019
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| LORI WASHINGTON, ex rel. J.W. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-1848 |
| | § | |
| KATY INDEPENDENT SCHOOL | § | |
| DISTRICT and ELVIN PALEY, | § | |
| | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

A public school officer in the Katy Independent School District's police department tased and handcuffed J.W., a 17-year-old special-education student.  His mother, Lori Washington, sued the Katy Independent School District and School Resource Officer Elvin Paley for violating of J.W.'s federally protected rights.  (Docket Entry Nos. 1, 12).  After discovery, the Katy School District and Officer Paley moved for summary judgment, Ms. Washington responded, and the Katy School District and Officer Paley replied.  (Docket Entry Nos. 28, 29, 31).

Based on the motion, response, and reply; the summary judgment record; the parties' arguments at the motion hearing; and the applicable law, the court grants the defendants' summary judgment motion for all claims except the § 1983 claim against Officer Paley.  (Docket Entry No. 28).  That claim remains.

The reasons for these rulings are detailed below.

**I.     Background**

In November 2016, J.W. was enrolled at the Mayde Creek High School in the Katy Independent School District.  He was diagnosed as emotionally disturbed and intellectually

disabled in ways that impacted "his daily functioning, including his ability to communicate, control his emotions, and access regular educational services without accommodations." (Docket Entry No. 12 at ¶¶ 31–32). According to the police incident report, J.W. was around 6'2" and weighed 250 pounds. (*See* Docket Entry No. 28-4 at 3, 11).

On November 30, 2016, J.W. was in a classroom playing a card game with another student. They started bickering, which developed into what J.W. described as "being bullied and harassed." (Docket Entry No. 29-2 at ¶ 6; *see* Docket Entry No. 28-6 at 2; Docket Entry No. 12 at ¶ 34). According to an unsworn statement by Ashley Lucas, a school staff member, J.W. cursed and yelled, then punched the other student in the chest and knocked him out of his chair. (Docket Entry No. 28-6 at 2). J.W. left the classroom and went down the hallway, continuing to yell and curse. (*Id.*). J.W.'s teacher emailed Assistant Principal Denise Majewski, who was responsible for the school's special-education students, to alert her of the situation. (Docket Entry No. 28-8 at 2, 6).

J.W. took himself to a "chill out" classroom that he used when he was upset. He found a student already there. (Docket Entry No. 29-2 at ¶¶ 8–9). Coach Larry Hamilton was standing outside that classroom talking with a student and saw J.W. throw a desk across the room, shouting that he "hated" the school. (Docket Entry No. 28-7). Hamilton saw J.W. kick the door, leave the occupied "chill" classroom, and continue down the hallway toward a door leading out of the school building. (*Id.*). School officials blocked him from leaving the building, and events escalated from there. (*See* Docket Entry No. 28-8 at 2–3; Docket Entry No. 28-9 at 2).

J.W.'s description of this first stage of the events is different. (Docket Entry No. 29-2). He did not mention in his declaration throwing a desk or cursing. He stated that after leaving the "chill-out" classroom, he walked "towards a door leading to a breeze way between buildings on

2

the campus," where he was stopped by a staff member who "loosely block[ed] the doors."  (*Id.* at ¶¶ 9–11).  A female Katy Independent School District police officer arrived soon after.  (*Id.* at ¶ 11).  J.W. stated that he told the staff member blocking the doors that keeping him inside was just making him more upset.  He asked to leave so that he could "cool down."  (*Id.* at ¶¶ 13, 14).  Minutes later, he "calmly walk[ed] toward the door nearest [him] and attempt[ed] to go outside," not touching anyone.  (*Id.* at ¶ 16).

Assistant Principal Majewski learned of the situation when J.W. left the "chill out room" and was in the hallway.  (Docket Entry No. 28-8 at 2).  Officer Elvin Paley, a school resource officer, stated in his declaration that Assistant Principal Majewski radioed for assistance to come help keep J.W. inside the school building.  (Docket Entry No. 28-1 at ¶ 3).  When Assistant Principal Majewski arrived at the scene, a school security guard, John Oglesby, and Coach Hamilton were trying to talk J.W. out of leaving the building.  Security guard Oglesby was blocking the door.  (Docket Entry No. 28-8 at 2; *see* Docket Entry No. 28-9 at 2).  Assistant Principal Majewski stated in her declaration that J.W. was "direct[ing] profanity toward the staff," and that she was concerned about J.W. leaving because the staff "would lose all control over him, and he might get injured."  (Docket Entry No. 28-8 at 2).

Officer Paley's body camera recorded J.W.'s interactions with the officers and school staff after that point.  The recording shows J.W. pacing in front of the door leading outside the school building and complaining to the school staff member blocking the door that he wants to leave so he could walk home and calm down.  He is not yelling at the staff members, but the video recording shows him looking agitated and occasionally raising his voice.  The recording then shows J.W. starting to push the door open.  (Docket Entry No. 28-10 at 12:45:54).  The staff member pushes back on the door to keep J.W. inside, but it does not appear that J.W. pushes the staff member, as

3

the Katy School District contends.  Within about five seconds of J.W. pushing on the door, Officer

Paley moves toward J.W. and the staff member.  Officer Paley's body camera then becomes dark

as he pushes up against J.W.'s body.  Both Officer Paley and the staff member tell J.W. to "calm

down" several times.  A male voice threatens J.W. with tasing.  About 20 seconds later, the male

voice says, "You are not going to get through this door, just relax."  (*Id.* at 12:46:05, 12:46:26).

J.W. then begins screaming.

The video becomes clear again as Officer Paley moves away from J.W.  The recording

shows two individuals holding J.W.  Approximately 10 seconds after Officer Paley tells J.W. to

relax, Officer Paley tells the individuals holding J.W. to "let him go," and fires the taser.  (*Id.* at

12:46:37).  J.W. immediately screams and falls to his knees.  About 5 seconds later, the video

recording shows Officer Paley beginning to "drive stun" J.W. near his bottom right torso, and then

on J.W.'s upper back.  (*Id.* at 12:46:41).[1]  "Drive stun" means to hold the taser against the body

without deploying the prongs.  J.W., still on his knees, then falls to the ground completely.  The

taser is used on J.W. for approximately 15 seconds.  (*Id.* at 12:46:56).  This use of the taser on

J.W.'s upper back continues after J.W. is lying face down on the ground and not struggling.

After Officer Paley stops tasing J.W., Officer Angela Molina, another school resource

officer, places handcuffs on J.W.'s wrists, behind his back.  (*Id.* at 12:47:11).  Less than a minute

later, while J.W. lies panting on the ground, Officer Paley points the taser at J.W.'s head, yelling,

"I did not want to tase you, but you do not run shit around here, you understand?"  (*Id.* at 12:47:50).

---

[1]  It is not clear from the video recording or the summary judgment evidence whether Officer Paley
drive stunned J.W. in separate uses of the taser or if he continued activating the taser when moving its
application to another part of J.W.'s body.  The video recording does show, however, that Officer Paley
drive stuns J.W. on both the lower torso and upper back.  (*See* Docket Entry No. 28-10).

According to Officer Paley, he used the taser the second time to drive stun J.W. because the first time did not have enough effect.  This second use of the taser brought J.W. to a prone position on the floor with his hands under his chest.  (Docket Entry No. 28-1 at ¶ 7).

J.W. stated that he began to scream and cry as Officer Paley tased him, and that Officer Paley kept tasing him "approximately six to eight times" even after he was on the ground.  (Docket Entry No. 29-2 at ¶¶ 24, 26).  According to J.W., when paramedics arrived, they had to remove a taser prong "embedded . . . near [his] right rib cage."  (*Id.* at ¶ 47).

J.W. thought he was under arrest.  He urinated and defecated on himself after being tased. (*Id.* at ¶¶ 29, 34).  J.W. stated that as he was being handcuffed, he began having difficulty breathing and, even after being moved to his side, he felt like he was going to die.  (*Id.* at ¶¶ 36, 37).  It was only when he was allowed to sit upright that he was able to "take a big gulp of air."  (*Id.* at ¶ 38).

Officer Paley stated that he called dispatch and asked for emergency medical services. (Docket Entry No. 28-1 at ¶ 9).  Officer Paley also told security guard Oglesby to get the school nurse.  (*Id.* at ¶ 8; Docket Entry No. 28-8 at 3, ¶ 5).  Officer Paley's body camera video recording shows school nurse Shirley Willett treating J.W.  The recording also shows the school officers and staff responding to J.W.'s reports of difficulty breathing.  (Docket Entry No. 28-10; *see also* Docket Entry No. 28-1 at ¶ 9; Docket Entry No. 28-8 at 3).

EMS arrived around 1:00 p.m., about 15 minutes after the tasing.  (Docket Entry No. 28-4 at 4, 14, 23; Docket Entry No. 28-1 at ¶ 10; Docket Entry No. 28-8 at ¶ 5).  J.W. was taken back to the school's security office around 1:30 p.m.  (Docket Entry No. 28-1 at ¶ 10; Docket Entry No. 28-8 at 3).  According to Vice-Principal Majewski, she tried to contact Ms. Washington shortly after that.  (Docket Entry No. 28-8 at 3).  J.W. stated that the school did not contact his mother until "the female paramedic inform[ed] the school officials that they should have contacted [his]

mother immediately." (Docket Entry No. 29-2 at ¶ 46; *id.* at ¶¶ 43, 49).  Vice-Principal Majewski

stated that when she called Ms. Washington's phone, it would not accept new messages, J.W.'s

emergency-contact number did not work, and emails to Ms. Washington went unanswered.

(Docket Entry No. 28-8 at 3).  At 2:00 p.m., Ms. Washington called Vice-Principal Majewski and

said that she was on her way to the school.  (*Id.*).

Before Ms. Washington arrived, Vice-Principal Majewski received a call from the

Westlake Emergency Medical Services explaining that another ambulance was going to the school,

at Ms. Washington's request.  (Docket Entry No. 28-8 at 3).  Ms. Washington had contacted EMS

because Vice-Principal Majewski had not informed her that another ambulance had already been

to the school and EMS had assessed J.W.  (Docket Entry No. 12 at ¶¶ 86–87; Docket Entry No.

29-1 at ¶¶ 24–25).  The second ambulance left the campus to take J.W. to the hospital at 3:05 p.m.

(Docket Entry No. 28-8 at 3).  Neither party describes the treatment J.W. received at the hospital.

Ms. Washington alleges that J.W. was not a danger to himself or others when he was tased.

She alleges that local school board policies allowed for detention only in limited circumstances

and required no more than a disciplinary-infraction citation—not physical detention—for students

who leave campus without permission.  (Docket Entry No. 12 at ¶¶ 4, 30).  She alleges that the

Katy School District staff who worked with J.W. were aware that he was being bullied, and that

they understood that "walking it off" was the best way for J.W. to cope with stressful situations.

(*Id.* at ¶¶ 35–37).

J.W. missed school for several months after the tasing.  Ms. Washington explained that she

kept J.W. home "due to fear for his safety while at school," and that J.W.'s "private medical

providers supported [that] decision."  (Docket Entry No. 29-1 at ¶ 34).  She stated that "J.W.

suffer[ed] from intense anxiety and PTSD" because of the tasing, "has lost his trust for police

officers," and was "traumatized by the experience," asserting that the video recording showed that "the taser touched J.W. seven times." (*Id.* at ¶¶ 35, 43, 45).  She stated that school and Katy School District staff would not talk to her about the incident, but she was able to watch a video recording provided by the superintendent's office. (*Id.* at ¶ 35).

Ms. Washington and Vice-Principal Majewski agree that the staff and Ms. Washington were unable to schedule a meeting until April 2017. (*Id.* at ¶ 36; Docket Entry No. 28-8 at 3–4). Ms. Washington stated that the staff abruptly cancelled that meeting when she arrived with an attorney. (Docket Entry No. 29-1 at ¶ 37).  According to Vice-Principal Majewski, she and other staff then tried to contact Ms. Washington, but Ms. Washington did not reliably or promptly respond.  (Docket Entry No. 28-8 at 3–4).

Vice-Principal Majewski stated that the scheduled April 2017 meeting was an Admission, Review, and Dismissal meeting, convened primarily to discuss J.W.'s absences, not to discuss the tasing. (*Id.* at 4).  She explained that the school rescheduled the April meeting after deciding that the school's attorney should attend if Ms. Washington was going to have counsel present. (*Id.*). The rescheduled meeting occurred on May 22, 2017, approximately six months after the tasing. (*Id.*).  The amended complaint alleged that the school staff "never scheduled the promised meeting to discuss the incident and continued to refuse Ms. Washington's requests to do so." (Docket Entry No. 12 at ¶ 101).

Ms. Washington sues Officer Paley under §§ 1983 and 1988 for discriminating against J.W. in violation of the Equal Protection Clause of the Fourteenth Amendment; for violating J.W.'s substantive and procedural due process rights to dignity, privacy, and bodily integrity; for using excessive force against J.W.; and for depriving J.W. of his right to an education under Article I of the Texas Constitution and the Fourteenth Amendment of the U.S. Constitution. (Docket Entry

No. 12 at ¶¶ 124–52).  Ms. Washington alleges that the Katy School District is liable for unconstitutional policies, procedures, practices, and customs, including failing to train and supervise staff, in violation of the Fourteenth Amendment; violating § 504 of the Rehabilitation Act of 1973; and failing to provide reasonable accommodations under Title II of the ADA.  (*Id.* at ¶¶ 119–23, 153–72).  Ms. Washington also alleges that the Katy School District is liable for Officer Paley's and other Katy School District employees' actions under a ratification theory.  (*Id.* at ¶¶ 173–76).

Each claim is analyzed below in light of the record and the applicable law.

## II.     The Summary Judgment Standard

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)).  "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).  "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'"  *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Id.* (quotation marks omitted); *see also Celotex*, 477 U.S. at 325.  Although the party moving for

summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

"Once the moving party [meets her or his initial burden], the non-moving party must 'go beyond the pleadings and by her [or his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *LHC Grp.*, 773 F.3d at 694). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

## III.   Analysis

### A.        The Summary Judgment Evidence

The defendants submitted the following summary judgment evidence:

- Officer Paley's declaration;
- Katy Independent School District Police Department Captain Kevin Tabor's declaration;

9

- Officer Paley's training and education record;

- Katy Independent School District Police Department's taser training materials and slideshow;

- The police report for J.W.'s tasing;

- Katy Independent School District Police Department's use of force and investigation into Officer Paley's use of the taser on J.W.;

- Katy Independent School District Police Department's report on Officer Paley's use of the taser on another student in 2017;

- Katy Independent School District Police Department's policies on the use of force and the use of tasers;

- Ashley Lucas's statement;

- Coach Larry Hamilton's sworn statement;

- Vice-Principal Majewski's declaration;

- Security guard Ogelsby's sworn statement;

- The body-camera video recording of the tasing;

- Ms. Washington's request for a Special Education Due-Process Hearing; and

- Texas Special Education Hearing Officer David A. Berger's order dismissing the due-process hearing.

(Docket Entry Nos. 28-1–28-12).  The defendants also submitted the Mayde Creek High School Student Handbook, Officer Paley's deposition, and Officer Paley's taser-download report with their reply.  (Docket Entry Nos. 31-1–31-3).

In response, Ms. Washington submitted:

- Her declaration;

- J.W.'s declaration;

- A selection of Katy Independent School District's policies and procedures; and

- "Documents produced by the [Katy Independent School District] during discovery," including J.W.'s school records.

(Docket Entry Nos. 29-1–29-5).  Ms. Washington's response explains that she incorporates by reference the first amended complaint and relies on "all other statements, arguments[,] and exhibits

provided by the Defendants in all their own pleadings filed in this [case], which evidence is deemed admitted and is self-authenticated."  (Docket Entry No. 29 at 8).

### B.    The Section 504 and ADA Claims

Ms. Washington alleged that because the Katy Independent School District "failed to provide [J.W.] a safe and non-hostile educational environment," it "contributed to violating J.W.'s rights pursuant to Section 504."  (Docket Entry No. 12 at ¶ 156).  According to the amended complaint, the Katy Independent School District "failed and refused to permit [J.W.] to leave the campus as they would have otherwise permitted a non-disabled student to do, solely because of his disability"; grossly deviated from professional care standards; made J.W. the victim of disparate impact and intentional discrimination under § 504; and "specifically undermined and interfered with" J.W.'s rights under § 504.  (*Id.* at ¶¶ 157–62).

Ms. Washington also alleged violations of Title II of the Americans with Disabilities Act. The amended complaint alleged that J.W. is a "qualified individual with a disability" and that the Katy Independent School District "failed and refused to reasonably accommodate and modify services to [J.W.]," including by not allowing him to leave campus as nondisabled students would have.  (*Id.* at ¶¶ 163–72).

Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  The ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The Fifth Circuit treats the liability standards as

equivalent in the school context. *Scherff v. S. Tex. Coll.*, No. 7:16-CV-658, 2017 WL 3783042, at

*4 (S.D. Tex. Aug. 29, 2017) (citing *Doe v. Columbia-Brazoria Indep. Sch. Dist.*, 855 F.3d 681,

690 (5th Cir. 2017)).

### 1.    Judicial Estoppel and the Exhaustion Argument

The Katy Independent School District argues that the court should grant summary

judgment dismissing the ADA and § 504 claims because Ms. Washington did not exhaust her

administrative remedies.   (Docket Entry No. 28 at 13–17).   They point to the Individuals with

Disabilities Education Act (IDEA), 20 U.S.C. § 1415 *et seq.*, which governs public education for

children with disabilities.   (*Id.* at 13).   The Act states that, "before the filing of a civil action under

such laws seeking relief that is also available under [the IDEA], the procedures under [the IDEA's

administrative review provisions] shall be exhausted to the same extent as would be required had

the action been brought under [the IDEA]." 20 U.S.C. § 1415(l).   Before suing, plaintiffs must file

with the appropriate state agency a complaint detailing the problems or issues "relat[ed] to the

identification, evaluation, or educational placement of the child, or the provision of a free

appropriate public education to such child."   20 U.S.C. §§ 1415(b)(6)(A), (f).   Complainants get

hearings before the Texas Education Agency and may bring an action in state or federal court only

after the Agency's hearings are complete.   *Hooker v. Dall. Indep. Sch. Dist.*, No. 3:09-CV-1289-

D, 2010 WL 4025877, at *5 (N.D. Tex. 2010).   A "plaintiff cannot escape [this requirement]

merely by bringing suit under a statute other than the IDEA."   *Fry v. Napoleon Cmty. Sch.*, 137 S.

Ct. 743, 754 (2017).

Ms. Washington filed an administrative complaint for a due-process hearing about the

tasing before the Texas Education Agency.   The Katy Independent School District argued to the

Hearing Officer that the administrative complaint should be dismissed for lack of jurisdiction.   Ms.

Washington asserts that the Katy Independent School District is now judicially estopped from arguing that this court lacks jurisdiction due to a failure to exhaust.  (Docket Entry No. 29 at 19).

"Judicial estoppel is a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position." *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988). The purpose of the doctrine is "to protect the integrity of the judicial process" by "prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self interest." *Id.* (internal marks omitted) (quoting *USLIFE Corp. v. U.S. Life Ins. Co.*, 560 F. Supp. 1302, 1304–05 (N.D. Tex. 1983)).  Judicial estoppel has three requirements: "(1) the party is judicially estopped only if its position is clearly inconsistent with the previous one; (2) the court must have accepted the previous position; and (3) the non-disclosure must not have been inadvertent."  *In re Superior Crewboats, Inc.*, 374 F.3d 330, 335 (5th Cir. 2004) (citing *Scarano v. Cent. R.R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953)).

In its response to Ms. Washington's due-process hearing complaint, the Katy Independent School District argued that "Special Education Due Process hearings are limited to matter relating to the identification[,] evaluation or educational placement of a child with disability, or the provision of [a free appropriate public education] to a child with a disability."  (Docket Entry No. 27 at 180 (citing 34 C.F.R. § 300.507(a))).  As a result, the Katy Independent School District argued, "[t]he Hearing Officer's sole jurisdiction in this matter is with regard to claims brought under the IDEA," and he does "not have jurisdiction to make specific rulings about whether specific facts" violated "the constitutional or federal laws other than the IDEA."  (*Id.* at 180–81).  The Katy Independent School District's argument before the Hearing Officer was that because he lacked jurisdiction to hear allegations of ADA or § 504 violations, and he could not make findings that would allow the Ms. Washington "to meet the administrative exhaustion requirements under

any statute other than the IDEA," the administrative claims had to be dismissed.  (*Id.*).  The Hearing Officer agreed and dismissed without prejudice all of Ms. Washington's claims, except for those brought under the IDEA, based on the lack of subject-matter jurisdiction.  (*Id.* at 122).

Other courts have considered whether judicial estoppel applies in similar circumstances. In *Boggs v. Krum Independent School District*, No. 4:17-cv-583, 2019 WL 1293851 (E.D. Tex. Mar. 21, 2019), the district court concluded that a school district was judicially estopped from arguing that the plaintiffs failed to administratively exhaust claims under the ADA and § 504 because the school district had stipulated in the administrative hearing that the "[p]laintiff's allegations did not raise 'issues related to the [IDEA] or concerns that the student did or did not receive a Free Appropriate Public Education,'" and the hearing officer dismissed the claims on that basis.  *Id.* at *4.  According to the court, "[t]he only reasonable way to interpret [the stipulation's] language is that [the p]laintiff's allegations do not raise IDEA issues that the State Agency need[ed] to decide one way or other, making any exhaustion requirement under the IDEA moot."  *Id.* at *5.  In *C.M. v. Cedar Park Charter Academy PTO*, No. 1:18-CV-644-RP, 2019 WL 1856414 (W.D. Tex. Apr. 24, 2019), the court acknowledged that the school district had taken inconsistent positions in its administrative-exhaustion argument for Title IX claims, because it had argued in the administrative due-process hearing that the hearing officer lacked jurisdiction to hear the Title IX claims and that "the hearing officer could not afford [the plaintiff] any remedies because he was no longer a student."  *Id.* at *4.  The court concluded, however, that because the plaintiffs had voluntarily dismissed their administrative complaint without prejudice, judicial estoppel did not prevent the school district from arguing failure to exhaust in the federal-court litigation.  *Id.*

Ms. Washington is correct that the Katy Independent School District argued to the Hearing Officer that he lacked jurisdiction over Ms. Washington's ADA and § 504 claims, and that the Hearing Officer dismissed those claims for lack of jurisdiction.  (Docket Entry No. 27 at 122, 180). However, the Katy Independent School District's position in the administration hearing and the current litigation position are not inconsistent.  The Katy Independent School District now argues that because Ms. Washington's claims under the ADA and § 504 overlap with relief sought under the IDEA, administrative exhaustion was required under the IDEA.  (Docket Entry No. 28 at 13–17).  Unlike the school district in *Boggs*, the Katy Independent School District did not argue that Ms. Washington's ADA and § 504 claims were unrelated to issues covered by the IDEA.  That the claims and relief sought under the ADA and § 504 overlapped with the IDEA is not inconsistent with this jurisdictional-exhaustion argument.

The defendants are not judicially estopped from arguing failure to exhaust in this litigation.

### 2.     Exhaustion of Administrative Remedies Under the IDEA

Because judicial estoppel does not bar the administrative-exhaustion argument, the court evaluates whether Ms. Washington had to administratively exhaust her § 504 and ADA claims and, if so, whether she did so in the administrative hearing she and J.W. received.   While administrative exhaustion is not required for claims under the § 504 and the ADA provision designed "to root out disability-based discrimination" in public institutions, the Supreme Court explained in *Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017), that exhaustion is required when a plaintiff claims "relief for the denial of a free appropriate public education."  *Id.* at 754.  Whether "the gravamen of a complaint against a school concerns the denial of a [free appropriate public education]" depends on whether (1) "the plaintiff [could] have brought essentially the same claim if the alleged conduct had occurred" outside of school and (2) "an adult at the school . . . [could] have pressed essentially the same grievance."  *Id.* at 756.  Pursuing the

IDEA's administrative remedies is often strong evidence that the gravamen of a plaintiff's claim is an IDEA claim based on the denial of a free and appropriate public education.  *Id.*

Not all § 504 or ADA claims against a school district relate to the denial of a free appropriate public education.  *Fry* set out a hypothetical to illustrate when administrative exhaustion would not be required:

> suppose that a teacher, acting out of animus or frustration, strikes a student with a disability, who then sues the school under a statute other than the IDEA . . . .  [T]he suit could be said to relate, in both genesis and effect, to the child's education. But the school districts opine, we think correctly, that the substance of the plaintiff's claim is unlikely to involve the adequacy of special education—and thus is unlikely to require exhaustion.

*Id.* at 756 n.9.  A plaintiff is also not required to exhaust administrative remedies under the IDEA when those remedies would be inadequate or futile.  *Honig v. Doe*, 484 U.S. 305, 327 (1988), *superseded on other grounds by statute*, 20 U.S.C. § 1415(k)(1)(G).

### a.       The § 504 and ADA Claims Required Exhaustion

Ms. Washington argues that the ADA and § 504 claims do not require administrative exhaustion based on *Fry*.  She asserts that when a school staff member injures a child, "there is no need to exhaust claims under the IDEA," citing *Dabney v. Highland Park Elementary School District*, No. 3:15-CV-2122-1, 2016 WL 1273467 (N.D. Tex. Mar. 31, 2016), to argue that when a plaintiff "alleges a 'pure discrimination claim' or 'non-education injuries' [that] cannot 'be redressed by the IDEA's administrative procedures and remedies,' the IDEA exhaustion requirement does not apply."  (Docket Entry No. 29 at 18 (quoting *Dabney*, at *6)).

Most of Ms. Washington's § 504 and ADA claims could not be brought if the alleged conduct had happened outside school.  The amended complaint alleges that the Katy Independent School District violated § 504 by "fail[ing] to provide the student a safe and non-hostile

educational environment." (Docket Entry No. 12 at ¶ 156).  This claim rests on J.W.'s student status; "an adult at the school" could not have brought the same claim.  *See Fry*, 137 S. Ct. at 756.

The amended complaint also alleges that J.W. is entitled to damages based in part on his "[l]oss of educational opportunities to the same extent as a non-disabled student."  (*Id.* at ¶ 183(a)).  According to Ms. Washington, the Katy Independent School District violated the ADA and § 504 by "fail[ing] and refus[ing] to permit [J.W.] to leave the campus as they would have otherwise permitted a non-disabled student to do," showing discrimination against J.W. under both laws.  (*Id.* at ¶¶ 157, 160–62, 169–70).  She alleges that "J.W. has a private cause of action against [the District] for their failure to follow relevant regulations promulgated pursuant to the ADA" and § 504, which injured J.W.  (*Id.* at ¶¶ 158, 171–72).  These regulations are not identified in the amended complaint or in Ms. Washington's response to the summary judgment motion.  Applying *Fry*, however, these claims clearly depend on J.W.'s student status and could not be brought if J.W. had been an adult visitor to the school.  Under *Fry*, Ms. Washington had to administratively exhaust the ADA and § 504 claims.

A plaintiff is not required to administratively exhaust claims if the plaintiff shows that administrative exhaustion would be futile or inadequate.  *See Gardner v. Sch. Bd. Caddo Par.*, 958 F.2d 108, 112 (1992) (quoting *Honig*, 484 U.S. at 327).  Ms. Washington argues that she is excused from administrative exhaustion J.W.'s because she seeks only monetary damages and because seeking administrative relief would be futile given that J.W. is no longer a student.  (Docket Entry No. 29 at 18–19).

District courts in this circuit and most circuit courts to address this issue have concluded that seeking damages rather than an injunction does not make the IDEA exhaustion requirement futile.  *Doe v. Dall. Indep. Sch. Dist.*, No. 3:17-cv-1284-B, 2018 WL 1899296, at *4 (N.D. Tex.

Apr. 19, 2018); *see also Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 131 n.7 (3d Cir. 2017).

("[A] plaintiff's request for remedies not available under the IDEA does not remove the claim

from being subject to exhaustion."); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 63 (1st Cir.

2002) (allowing plaintiffs to circumvent the IDEA administrative process by seeking only relief

that the IDEA administrative officials cannot grant would undermine the statute); *but see J. A. v.

Corpus Christi ISD*, No. 2:17-CV-182, 2018 WL 4469861, at *5 (S.D. Tex. Sept. 18, 2018)

("Because administrative exhaustion would be futile with respect to J.A.'s claims for tort-based

damages, it is not a prerequisite to bringing these claims in this Court."). The Fifth Circuit has

suggested its agreement with this reasoning. *See Doe v. E. Baton Rouge Par. Sch. Bd.*, 121 F.3d

705, 1997 WL 450173, at *1 (5th Cir.1997) (unpublished) (affirming a district court's dismissal

of a § 1983 suit for money damages because a remedy was available under the IDEA and

exhaustion was required).

J.W.'s age and stage do not show futility. In *Ripple v. Marble Falls Independent School

District*, 99 F. Supp. 3d 662 (W.D. Tex. 2015), the district court considered the plaintiff's argument

that an IDEA claim against a school district would be futile because he had graduated from high

school and was over 21. *Id.* at 687. The court explained that most courts examining whether

graduation and age show futility conclude that a "plaintiff[] cannot sidestep the exhaustion

requirements by seeking non-IDEA relief after the plaintiff has graduated." *Id.* at 688 (citing

*McCormick v. Waukegan Sch. Dist. No. 60*, 374 F.3d 564, 568 n. 2 (7th Cir. 2004)). J.W. was a

student during, and for months after, the tasing. He could have sought relief while still a student

through the administrative process, which could have changed his individualized education plan

or resulted in additional services. *See Polera v. Bd. of Educ. of Newburgh Enlarged City Sch.

Dist.*, 288 F.3d 478, 490 (2d Cir. 2002) ("[W]e reiterate our holding that disabled-student plaintiffs

. . . should not be permitted to 'sit on' live claims and spurn the administrative process . . . .  The

fact that the administrative process could not provide damages does not render [the plaintiff's]

claim futile; she could have obtained complete relief at the time, through changes to her IEPs,

additional educational services, and, if necessary, remedial education.").

Ms. Washington has not shown that the administrative process would have been futile.

**b.      Whether Ms. Washington Administratively Exhausted the Claims**

Ms. Washington filed a petition on December 4, 2017, with the Texas Education Agency,

asking the Agency to appoint a hearing officer under 20 U.S.C. § 1415(b)(7).  (Docket Entry No.

28-11).  The petition raised claims under § 504, the ADA, and § 1983.  (*Id.*).  The Katy Independent

School District responded by asking for the dismissal of the non-IDEA claims on the ground that

the Agency lacked jurisdiction.  (Docket Entry No. 27 at 71–72).  In February 2018, the Hearing

Officer dismissed the non-IDEA claims for lack of jurisdiction.  (*Id.* at 180–81).

"Exhaustion requires more than pleading a claim . . . it requires 'findings and decision' by

the administrative body."  *Reyes v. Manor Indep. Sch. Dist.*, 850 F.3d 251, 256 (5th Cir. 2017).

The Katy Independent School District argues that because the "belated due process complaint was

dismissed on grounds of timeliness," Ms. Washington cannot now show exhaustion.  (Docket

Entry No. 28 at 16).

The summary judgment evidence shows no factual disputes material to concluding that

Ms. Washington did not and cannot show that she exhausted her administrative remedies.  The

Hearing Officer found that the petition requesting a due-process hearing under the IDEA was filed

"four days beyond the statute of limitations" set by the Texas Administrative Code.  (Docket Entry

No. 27 at 117; Docket Entry No. 28-12 at 9).  The Hearing Officer concluded that the Ms.

Washington did not prove by a preponderance of the evidence that a limitations exception applied

and dismissed the IDEA claims as time-barred.  (Docket Entry No. 27 at 71–72).  Because there were no "'findings and decision' by the administrative body" on the merits, Ms. Washington did not exhaust administrative remedies.  Summary judgment is granted to the defendants on the non-IDEA claims.

### C.   The Claims Against Officer Paley

#### 1.   Excessive Force

##### a.   The § 1983 Claims Against Officer Paley for Violating J.W.'s Fourth Amendment Rights

The defendants suggest that the Fifth Circuit's decision in *Fee v. Herndon*, 900 F.2d 804 (5th Cir. 1990), holding that the plaintiffs could not bring substantive due-process claims under § 1983 for excessive corporal punishment if the state had adequate state-law remedies, entitles them to summary judgment on the § 1983 claims against Officer Paley for his use of force against J.W.  (Docket Entry No. 28 at 22).  Ms. Washington responds that "J.W.'s injuries were not pursuant to corporal punishment and as such the cases cited by [Officer Paley] in regard to 14th Amendment due process claims[] do not help him in regard to 4th Amendment claims."  (Docket Entry No. 29 at 27).

The defendants are correct that courts have interpreted *Fee* to preclude substantive due-process claims against school officials for using corporal punishment on students.  *See, e.g.*, *Marquez v. Garnett*, 567 F. App'x 214, 217–18 (5th Cir. 2014); *D.A. v. Hous. Indep. Sch. Dist.*, 716 F. Supp. 2d 603, 625 (S.D. Tex. 2009), *aff'd sub nom. D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist.*, 629 F.3d 450 (5th Cir. 2010).  Less clear is *Fee*'s application to excessive-force claims against police officers for injuring students on school grounds.[2]  This is consistent with the Fifth

---

[2] Officer Paley works for the Katy Independent School District Police Department.  Neither party has argued that the standards for police officers in municipal police departments do not apply to a school district's police force.

Circuit's statement that "the scope of the Fourth Amendment is not limited to criminal investigations, but rather, extends generally to searches and seizures by government actors." *Campbell v. McAlister*, 162 F.3d 94, 1998 WL 770706, at *3 (5th Cir. 1998) (unpublished) (citing *New Jersey v. T.L.O.*, 469 U.S. 325 (1985)); *see also Milligan v. City of Slidell*, 226 F.3d 652, 654 (5th Cir. 2000) ("The [Supreme] Court [has] indicated that although the Fourth Amendment applies in schools, the nature of those rights is what is appropriate for children in school.'").

When faced with similar Fourth and Fourteenth Amendment claims against a police officer who used force that injured a student on school grounds, the Fifth Circuit has not applied *Fee* to foreclose § 1983 excessive-force claims under the Fourth Amendment.  *See Curran v. Aleshire*, 800 F.3d 656, 660 (5th Cir. 2005).  In other cases involving police officers' searches and seizures of students on school grounds, courts have allowed, and analyzed under the reasonableness standard, § 1983 excessive-force claims alleging Fourth Amendment violations.  *See, e.g.*, *id.*; *Foster v. McLeod Indep. Sch. Dist.*, No. 5:08-CV-71, 2009 WL 175154, at *14–*15 (E.D. Tex. Jan. 23, 2009).  *Fee* does not foreclose Ms. Washington's § 1983 excessive-force claim against Officer Paley.

### b.    The Record Evidence on Qualified Immunity

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity "is an affirmative defense; once properly raised by the defendant, the 'plaintiff has the burden to negate the assertion of qualified immunity.'" *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (quoting *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009)).  If invoked, a court must first find "that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).  "[C]onclusory

allegations and unsubstantiated assertions" cannot overcome the defense. *Miller v. Graham*, 447 F. App'x. 549, 551 (5th Cir. 2011). "A plaintiff can overcome a qualified immunity defense by showing '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016) (per curiam) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)). Courts have discretion to decide which of the two elements to address first. *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015).

"When considering a defendant's entitlement to qualified immunity, [a court] must ask whether the law so clearly and unambiguously prohibited his conduct that '*every* reasonable official would understand that what he is doing violates [the law].'" *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (emphasis and alteration in original) (quoting *al–Kidd*, 563 U.S. at 741). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). The court "must be able to point to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d at 371–72 (quoting *al–Kidd*, 563 at 742). A case directly on point is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *al–Kidd*, 563 U.S. at 741). The plaintiff must also show that the defendant's conduct was objectively unreasonable. *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008). "An official's actions are "objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the conduct violated the Constitution." *Id.* at 419.

22

To establish excessive force under the Fourth Amendment, a plaintiff must show: "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (citing *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009)). The reasonableness inquiry "requires analyzing the totality of the circumstances." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014). Determining if the force used was excessive "requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989). A court must consider only the information available to the officer at the time and must recognize that officers often make split-second decisions in stressful situations. *Id.*

The defendants argue that clearly established law permitted an officer to use force that was not "clearly excessive to the need" or "objectively unreasonable," and that Officer Paley's actions were objectively reasonable. (Docket Entry No. 28 at 19–20). They point to the amended complaint's admission that J.W. "was in the midst of an emotional breakdown and anxiety attack" as evidence that that the situation required Officer Paley to physically restrain J.W. (*Id.* at 20 (citing Docket Entry No. 12 at ¶ 3)). The defendants primarily rely on Officer Paley's police report, which describes J.W.'s behavior and cursing, the staff's failed attempts to get J.W. to go back to his classroom, and J.W.'s failure to comply with verbal commands and physical attempts to keep him from leaving the school building. (*Id.* at 20–21 (citing Docket Entry No. 28-4)). The defendants also point to J.W.'s physical size to support Officer Paley's decision to use the taser. J.W. was bigger and heavier than Officers Paley and Molina. (*Id.* at 21). Officer Paley's statement in the police report states that he had concluded that the school staff's attempts to subdue J.W. with "soft and hard hand techniques were not effective" before he decided to use the taser. (Docket Entry No. 28-4 at 4). The defendants contend that the video recording from Officer Paley's body

23

camera supports his statements that before he used the taser and after J.W. "pushed" security guard Oglesby and resisted attempts to calm him down, Officer Paley went to the next step on the "use of force continuum."  (Docket Entry No. 28 at 20–22; Docket Entry No. 28-1 at ¶ 6).

Ms. Washington responds that the right to be free of excessive force was clearly established, including the right to be free of excessive force from an officer's use of a taser. (Docket Entry No. 29 at 25 (citing *Poole v. Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012))). According to Ms. Washington, Officer Paley's actions were not objectively reasonable because J.W. did not commit a crime, there was no immediate safety risk to the officers, J.W. was not "evading arrest because he was never under arrest," and J.W. "was not disobeying any police orders or being non-compliant with police orders" because he did not receive orders before the tasing.  (*Id.* at 25–26).  Ms. Washington also asserts that "J.W.'s injuries were not pursuant to corporal punishment," and that it was objectively unreasonable for Officer Paley to continue to tase J.W. after he was lying helpless on the ground.  (*Id.* at 27).

### i.       Whether Officer Paley's Force Was Excessive

"Students have a constitutional right under the Fourth and Fourteenth Amendments to be free from unreasonable searches and seizures while on school premises."  *Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608, 621–22 (5th Cir. 2004) (citing *T.L.O.*, 469 U.S. at 334–37).  However, "the nature of those rights is what is appropriate for children in school."  *Milligan v. City of Slidell*, 226 F.3d 652, 654–55 (5th Cir. 2000).  "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the school's custodial and tutelary responsibility for children."  *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995).

The defendants cite several cases to support their argument that Officer Paley's actions were objectively reasonable as a matter of law.  In *Orr v. Copeland*, 844 F.3d 484 (5th Cir. 2016), an officer tased a suspect who had fallen to the ground.  *Id.* at 492–93.  The court found this

objectively reasonable because the suspect had driven off at high speed after officers ordered him to step out of his vehicle, and then continued to evade the officers when the chase continued on foot. *Id.* at 493. In *Carroll v. Ellington*, 800 F.3d 154, 176 (5th Cir. 2015), the officers' use of a taser on a suspect in the suspect's home was objectively reasonable because the suspect "failed to comply with verbal task directions and actively resisted all attempts to subdue and detain him." *Id.* at 176. Because the officers "responded with measured and ascending actions that corresponded to the [suspect's] 'escalating . . . physical resistance,'" the court concluded that they were entitled to qualified immunity. *Id.* at 176 (internal quotation marks omitted). And in *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012), the court concluded that the officers' conduct was not clearly excessive or objectively unreasonable when they tased the suspect after that suspect disobeyed commands and struggled against being physically restrained. *Id.* at 629. The defendants also cite the Mayde Creek High School Student Handbook as evidence that school rules forbade students from leaving the school without permission, and cite the evidence showing that J.W. was physically resisting officials and officers. (Docket Entry No. 31-1). J.W.'s declaration does not describe any cursing or physical struggling to leave the building, but does describe his pleas to school officials to be allowed to leave so that he could "walk it off" and cool down. (*See* Docket Entry No. 28-4; Docket Entry No. 29-2).

Whether Officer Paley's force was objectively reasonable requires looking at similar cases involving excessive force in the school context. *See Thomas v. City of New Orleans*, 883 F. Supp. 2d 669, 688 (E.D. La. 2012) ("If the Fifth Circuit has declined to recognize school children's claims under the Fourth Amendment for school officials' use of restraining techniques, it seems that school children's claims against police officers responding to a school's request for back-up cannot be analyzed in a way that is divorced from the school context.").

The Fifth Circuit has explained that "[t]he Fourth Amendment's reasonableness standard must afford school officials with a relatively wide range acceptable action in dealing with disruptive students." *McAlister*, 162 F.3d at *1 (citing *T.L.O.*, 469 U.S. at 340 ("[M]aintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship")). "The fact that less force could have been used, or that a more appropriate punishment may have been available, is not enough to establish that the punishment administered was unconstitutional." *Id.* (citing *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1081–82 (5th Cir.), *cert. denied*, 516 U.S. 995 (1995).

As with any suspect, a student's "active resistance is a key factor in the Fourth Amendment's 'objective reasonableness' test." *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015) (citing *Graham*, 490 U.S. at 396). Officers may "use reasonable force to subdue and handcuff suspects who strike them or are otherwise resisting," but "the force calculus changes substantially once that resistance ends." *Id.* (citing *Ballard v. Burton*, 444 F.3d 391, 401 (5th Cir. 2006)). Once the student stops resisting, the officer must stop using physical force aimed at subduing resistance. In *Curran*, a high-school student alleged that a sheriff's deputy violated her Fourth Amendment rights by slamming her head into a wall after she had hit the deputy, but after she had stopped struggling or resisting. *Id.* at 658–59. On interlocutory appeal, the Fifth Circuit concluded that there were genuine factual disputes material to determining whether the student was "resisting at the time" of the force, when "no other *Graham* factor [was] implicated" because the student was "not attempting to flee, [the officer] did not fear for his own safety, and no bystander was endangered by [the student's behavior]." Summary judgment was not appropriate. *Id.* at 662.

Second, it is not always unreasonable for school officials to use force when a student fails to follow instructions and is disruptive—as long as the force used is reasonable in amount and duration.  In *Campbell v. McAlister*, 162 F.3d 94, 1998 WL 770706 (5th Cir. 1998), the court considered allegations that a school official had used excessive force to remove a disruptive kindergartener from a classroom.  *Id.* at *1.  The court noted that the student "had refused to leave the room or even stand up" after "[r]epeated requests that he voluntarily do so."  *Id.* at *4.  The student alleged that the official "'slammed [the student] to the floor' and 'dragged [him] along the ground to the principal's office,'" which resulted in bruising.  *Id.* at *1.  The court found that the use of force was objectively reasonable because the "alleged efforts to subdue" the student "were fairly tailored to [the student's] admitted misbehavior."  *Id.* at *5.

Courts in the Fifth Circuit have not squarely addressed what constitutes an objectively unreasonable use of a taser against a student.  Outside the Fifth Circuit, several cases offer guidance.  Most cases suggest that an officer's use of a taser against a student may be objectively reasonable if the student was warned before the officer deployed the taser, and the student was resistant, fighting, or struggling with the officers.  In *Johnson v. City of Lincoln Park*, 434 F. Supp. 2d 467, 478 (E.D. Mich. 2006), the student had a pattern of disruptive behavior, failed to comply with school official's requests to hand over a videogame, and struggled against the officers who tried to subdue him.  *Id.* at 469–70.  A school resource officer warned the student that unless he stopped resisting, the officer would use a taser, and showed the student how it worked.  *Id.* at 470.  When the student's resistance continued, the officer used his taser.  The student said later that it did not hurt but merely "tickled."  *Id.* at 478.  The court concluded that the officer was entitled to qualified immunity because the use of force was limited.  *Id.*

In contrast, the court in *Geist v. Ammary*, 40 F. Supp. 3d 467 (E.D. Pa. 2014), concluded that there were genuine factual disputes material to determining whether the force used was excessive because it was unclear if the officer had warned a student that he was about to use his taser. *Id.* at 480–82. "Whether warnings were given prior to tasing is important to showing whether this use of force was appropriate." *Id.* at 480 (citing *Brown v. Cwynar*, 484 F. App'x. 676 (3d Cir. 2012) (tasing a criminal suspect during an arrest was not excessive after an officer was called to deal with the plaintiff's disruptive behavior and the plaintiff did not comply with the officer's requests)); *see also R.T. v. Cincinnati Pub. Schs.*, No. 1:05-cv-605, 2006 WL 3833519, at *2 (S.D. Ohio Dec. 29, 2006) (an officer's use of force was reasonable when tasing a student who was creating a disturbance, did not comply with the officer's repeated orders, kicked and bit the officer, and was warned that she would be tased if she persisted).

Ms. Washington looks outside the case law to argue that Officer Paley's use of force was objectively unreasonable because he did not follow school policies and procedures. (Docket Entry No. 29 at 27). She argues that the policies require school-security staff, including school resource officers like Officer Paley, to "make a good-faith effort to divert a person suffering from a mental health crisis for treatment when that person is in the midst of a crisis." (*Id.* at 16 (citing 29-5 at 8)). She argues that Katy Independent School District School Board policies allow force "when a student is out of control, but only 'to further educational purposes' or 'to maintain discipline in a group.'" (*Id.*). She also asserts that the Texas Education Code forbids a "discipline management practice [that is] calculated to inflict injury, cause harm, or demean the student." (*Id.* (citing TEX. EDUC. CODE § 37.002(b)(1); 19 T.A.C. § 89.1053)). Ms. Washington argues that the Katy Independent School District and Officer Paley violated these policies and procedures when J.W. was tased and restrained. (*Id.* at 17). This argument does not address qualified immunity in a §

1983 action.  The critical question is whether Officer Paley violated J.W.'s federally protected rights, not whether he followed school policies or state law.

The record shows that J.W. refused to follow school staff members' and officers' instructions, was agitated and insistent on leaving, and that Officer Paley gave warnings before using the taser, but it is disputed that he pushed a staff member, so as to justify the taser use.  And Officer Paley did not stop using the taser when J.W. stopped resisting.  The record evidence of Officer Paley's interactions with J.W. shows genuine factual disputes material to deciding whether the tasing itself, its length, and its intensity, were objectively reasonable. These disputes preclude summary judgment.

Officer Paley asserts that he decided to intervene only after he "saw J.W. make physical contact with Guard Oglesby and Guard Oglesby start[ed] to fall backward."  (Docket Entry No. 28-1 at ¶ 6).  Officer Paley asserts that he first tried "soft or hard hand techniques" on J.W., while also telling J.W. to calm down, but those efforts did not work.  (*Id.*).  Officer Paley states that he then "told [J.W.] that [he] didn't want to tase him and that he needed to calm down . . . but J.W. just replied 'Do it, fucking it!'"  (*Id.*).  According to Officer Paley, it was then that he decided to use the taser.  (*Id.* at ¶ 7).  When the first tasing did not work, he "drive stunned" J.W.  (*Id.*).  Officer Paley does not mention two drive-stun applications.  (*See id.*).  Officer Paley's statement in the police report does not state whether he gave J.W. a warning, but it is consistent in recounting that he used the taser at least twice.  (*See* Docket Entry No. 28-4 at 4).  The taser-download report shows one deployment, but it lasted a total of 19 seconds.  (Docket Entry No. 31-3 at 6).

Officer Molina's statement in the police report is consistent with Officer Paley's version of events.  (*See id.* at 12).  She notes that J.W. was told that he could not leave the school and became "non-responsive to any of [the school officers' and officials'] communication with him."

(*Id.*).  She states that J.W. "started pushing his way through Security Guard Oglesby."  (*Id.*).  According to Officer Molina and Officer Paley "instructed [J.W.] to calm down several times" as he, security guard Oglesby, and Officer Molina all held J.W.  (*Id.*).  She states that "Officer Paley told [J.W.] that he did not want to have to taser him and that he needed to calm down," to which J.W. "replied 'do it, fucking do it' and pushed with extreme force through the doorway."  (*Id.*).  She states that Officer Paley used the taser twice, stopping after J.W. was lying on the ground.  (*Id.*).

Vice-Principal Majewski's and security guard Oglesby's statements to the Katy Independent School District Police Department also state that Officer Paley gave J.W. a warning.  (*Id.* at 14, 16).  Vice-Principal Majewski reiterates in her declaration that Officer Paley tased J.W. only after he "tried to push his body against Officer Oglesby at the exit of the building," and that Officer Paley "told J.W. several times that he would tase [J.W.] if [J.W.] continued."  (Docket Entry No. 28-8 at 3, ¶ 4).

J.W.'s declaration tells a different story.  He states that as he tried to leave the school building because he was feeling anxious and knew that only "walking it off" would calm him, "the male official closest to [him] initiated physical contact . . . and for no apparent reason attempted to block [him] from exiting the building."  (Docket Entry No. 29-2 at ¶ 17).  J.W. asserts that "Officer Paley then briskly walked towards [him] and "start[ed] to tase [him] and had [him] against a pole in a chokehold."  (*Id.* at ¶¶ 18–19).  J.W. states that after the first taser use, while he was in pain and had turned his back away from the officers, Officer Paley used the taser.  (*Id.* ¶¶ 21–22).  According to J.W., Officer Paley continued to tase him even after he was on the ground, hitting him "with his taser gun six to eight times," until a staff member told Officer Paley to stop.  (*Id.* at ¶¶ 23, 26).

The body-camera recording underscores factual disputes that are material to determining whether Officer Paley's tasing was reasonable. While the recording shows J.W. disagreeing with school staff about leaving, it is unclear that he pushed against a staff member or a security guard when trying to go through the door. (Docket Entry No. 28-10 at 12:45:54). In less than one minute after J.W. tried to exit, he begins screaming, is tased, falls to his knees, and has the taser held against him until he falls to the ground. (*Id.* at 12:46:37). While Officer Paley stated that the first tasing had no effect on J.W., the video recording shows J.W. falling to his knees when Officer Paley "drive stuns" J.W. The drive stunning either continues or is repeated until J.W. lies completely flat. (*Id.* at 12:46:56–47:11). Officer Paley then aims the taser at J.W.'s head and threatens him for several seconds after J.W. is no longer moving and is flat on the ground. (*Id.* at 12:47:50).

The questions on which the evidence conflicts include whether it was objectively reasonable to believe that the force used was needed to keep J.W. in the building, and, perhaps more critically, whether Officer Paley's continued use of the taser, including the "drive stun" technique, after J.W. fell to his knees was reasonable. These and related disputes preclude summary judgment.

### ii.      The Decision to Place J.W. in Handcuffs

The defendants argue that this court should follow cases concluding that similar procedures "to immobilize and eventually handcuff suspects is both reasonable and not an excessive use of force." (Docket Entry No. 28 at 21 (citing *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir.

2002); *Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001); *Jones v. Webb*, 45 F.3d 178 (7th Cir. 1995))).  Ms. Washington did not respond to this argument.

As discussed above, courts have found that an officer's decision to handcuff a student is objectively reasonable if the student is a danger to the officers or others, including himself or herself, or if the student is actively resisting the officer's verbal and physical commands.  The officer must stop applying force when the student has stopped resisting.  The defendants cite witness declarations and the police report as evidence that attempts to calm J.W. had failed and school staff could not convince J.W. to stay inside the building.  (*See* Docket Entry No. 28-4).  The summary judgment evidence also shows, and Ms. Washington has not pointed to conflicting evidence, that Officer Paley and school officials contacted medical help when J.W. said that he had difficulty breathing, and the officers positioned J.W. to prevent breathing problems.  (*See* Docket Entry No. 28-1 at ¶ 8).

Because Ms. Washington has not offered or identified summary judgment evidence to dipsute the defendants' arguments and evidence, there is no genuine factual dispute material to concluding that Officer Paley's decision to handcuff J.W. and keep him on the floor did not violate J.W.'s Fourth Amendment rights.

### 2. J.W.'s Due-Process Rights

Ms. Washington alleges that Officer Paley violated J.W.'s substantive and procedural due-process rights, including his liberty interest in bodily integrity.  "[S]chool children have a liberty interest in their bodily integrity protected by the Due Process Clause of the Fourteenth Amendment, and . . . physical abuse by a school employee violates that right."  *Arevalo-Rivas v. Austin Indep. Sch. Dist.*, No. A-15-CV-430-LY, 2015 WL 7161995, at *4 (W.D. Tex. Nov. 13, 2015) (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451–52 (1994), *cert. denied*, 513 U.S. 815 (1994)).  However, a student may not bring a substantive-due process claim for corporal

punishment intended to discipline the student, even if the punishment was excessive, because Texas provides adequate administrative remedies. *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 875 (5th Cir. 2000).

A threshold question is whether Officer Paley's actions were corporal punishment. "[F]airly characterizing an act as corporal punishment depends on whether the school official intended to discipline the student for the purpose of maintaining order or respect or to cause harm to the student for no legitimate pedagogical purpose." *Flores v. Sch. Bd. of DeSoto Par.*, 116 F. App'x 504, 511 (5th Cir. 2004). In *Marquez v. Garnett*, 567 F. App'x 214 (5th Cir. 2014), a teacher allegedly "cursed and yelled" at, shoved, and "repeatedly kicked" a severely autistic and physically disabled student because the student "was sliding [the teacher's] compact disc across a table during class time." *Id.* at 217. The court concluded that because "the setting [was] pedagogical, and [the] student's action was unwarranted," the teacher's actions were corporal punishment. *Id.* When the use of force is not related to an educational goal, this analysis does not apply. In *Doe v. Taylor Independent School District*, 15 F.3d 443 (5th Cir. 1994), the court considered whether a student alleging that a teacher had sexually abused her stated a viable Fourteenth Amendment claim for a violation of bodily integrity. *Id.* at 451. The court concluded that *Fee* did not preclude this claim because that alleged abuse was not related to an educational goal. *Id.*

The defendants point to *McAlister*, which concluded that *Fee* foreclosed the substantive due-process claim because "injuries sustained incidentally to corporal punishment, irrespective of the severity of these injuries or the sensitivity of the student, do not implicate the due process clause if the forum state affords adequate post-punishment civil or criminal remedies for the student to vindicate legal transgressions." *McAlister*, 1998 WL 770706, at *5 (quoting *Fee*, 900

F .2d at 808). Because the "use of force to remove [the student] from [the] classroom [was] rationally related to legitimate school interests in maintaining school interests," and because "Texas provides civil and criminal post-deprivation remedies for the excessive use of force by school officials," the due-process claim failed as a matter of law. *Id.*

While Ms. Washington argues that the force used against J.W. was not a form of discipline, she concedes in the amended complaint that restraints may be a form of discipline. (Docket Entry No. 12 at ¶ 23). The force used against J.W. can be characterized as discipline because the summary judgment evidence supports that it was rationally related to the school's legitimate interest in maintaining order and keeping J.W. safe. Summary judgment evidence shows that J.W. was yelling and cursing at school staff members, had thrown a classroom desk, punched and pushed another student, was attempting to leave the building by himself during school hours, and refused school officials' efforts and orders to stay inside. Under *Fee*, Ms. Washington cannot maintain her due-process claims based on Officer Paley's use of force. The defendants are entitled to summary judgment as a matter of law on these claims.

### 3. J.W.'s Equal Protection Rights

The amended complaint alleges that Officer Paley's actions "singularly discriminated against J.W. when treating him in a disparate manner as compared to other students similarly situated." (Docket Entry No. 12 at ¶ 144). The defendants argue that the complaint "failed to allege any facts that would suggest that any protected class which J.W. might belong actually motivated Officer Paley's actions towards J.W." (Docket Entry No. 28 at 24). Ms. Washington did not address this issue in her response. (*See* Docket Entry No. 29).

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne*

*Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe,* 457 U.S. 202, 216 (1982)).  To state an equal-protection claim for a class of one, a plaintiff must allege that he or she has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citing cases).

Ms. Washington alleges that J.W.'s disabilities led the school officials to keep him from leaving the building to walk home by himself, while a nondisabled student would have been free to do so.  The amended complaint does not allege, and the summary judgment does not support an inference, that Officer Paley's refusal to let J.W. leave the building, the tasing, or the use of handcuffs was motivated by animus based on J.W.'s status as a member of a protected class. (Docket Entry Nos. 12, 29).  Ms. Washington has not offered or identified summary judgment evidence showing that a nondisabled student would have been allowed to leave campus, and the defendants point to the Mayde High School Student Handbook, which forbids students from leaving school without permission during the school day.  And to the extent J.W.'s disabilities triggered additional concerns that his own safety was at risk if allowed to leave unsupervised, there is no basis to find invidious discrimination motivated by animus.  *See Sadik v. Univ. of Hous.*, No. CIV.A. H-03-4296, 2005 WL 1828588, at *10 (S.D. Tex. Aug. 1, 2005)*.*  Summary judgment is granted to the defendants on this claim.

### D.     The § 1983 Claims Against the Katy Independent School District

The amended complaint asserts § 1983 claims against the Katy Independent School District for excessive force, a deprivation of J.W.'s liberty interest in bodily integrity, a deprivation of J.W.'s privacy interest in bodily integrity, and violations of J.W.'s right to equal protection, all under the Fourth and Fourteenth Amendments.  (Docket Entry No. 12 at ¶¶ 124–36, 139, 140, 144).  Ms. Washington's counsel informed the court at the motion hearing that Ms. Washington was abandoning these claims.  Summary judgment is granted on these claims.

35

### E.      The Claim for Violation of a Constitutional Right to an Education

The amended complaint alleges that Officer Paley's actions "violated J.W.'s rights under the Constitution of Texas and the Constitution of the United States as to a free and proper education." (Docket Entry No. 12 at ¶ 146).  Ms. Washington relies on the Fourteenth Amendment of the federal Constitution and Article 1, §§ 3 and 4 of the Texas Constitution for this right.  (*Id.* at ¶¶ 147–49).

The case law is clear that education is not a fundamental right under the federal Constitution.  *See Plyler*, 457 U.S. at 221 ("Public education is not a 'right' granted to individuals by the Constitution."); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution.  Nor do we find any basis for saying it is so implicitly protected.").  If a State maintains a public system and requires children in that State to attend, then the "State is constrained to recognize a student's legitimate entitlement to a public education as a property interest, which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause."  *Goss v. Lopez*, 419 U.S. 565, 574 (1975).  In *Swindle v. Livingston Parish School Board*, 665 F.3d 386, 393 (5th Cir. 2011), the Fifth Circuit interpreted *Goss* to require that a student "facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing."  *Id.* at 397 (internal quotation marks omitted).  The court explained that due process requires a student to have an opportunity to explain his or her version of events before an official may suspend that student.  In reaching this conclusion, the court relied on a Louisiana statute directing school boards to provide public education generally and to provide suspended or expelled students alternative education.  *Id.* at 402.

36

The record evidence does not support finding that Officer Paley's actions denied J.W. a right to participate in the education process at the Mayde Creek High School.  The amended complaint does not allege that J.W. was expelled or disciplined, which would, at minimum, require the school to comply with J.W.'s due-process right to explain his version of events. The summary judgment evidence instead shows that after the incident, Ms. Washington decided to keep J.W. home from school because she "fear[ed] for his safety."  (Docket Entry No. 12 at ¶ 114).  The defendants have pointed to evidence that school officials tried to contact Ms. Washington about J.W.'s absences, but she responded only sporadically and did not send J.W. back to school for six months.  (Docket Entry No. 28-8 at 3–4, ¶¶ 11–14).

To the extent that the claim is brought against Officer Paley, he is entitled to qualified immunity.  Officer Paley's actions did not violate a clearly established constitutional "right to an education."  Ms. Washington's allegations that Officer Paley violated the Texas Constitution fail because Texas has no provision analogous to 42 U.S.C. § 1983, and the Texas Supreme Court has held that there is no implied cause of action for damages under the Texas Constitution.  *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 147 (Tex. 1995).  Ms. Washington does not seek equitable relief.

The defendants are entitled to summary judgment as a matter of law on this claim.

## IV.    Conclusion

The defendants' summary judgment motion on the claims for violations of the ADA, the Rehabilitation Act, the Equal Protection Clause, and J.W.'s due-process rights to bodily integrity is granted.  Summary judgment is also granted to the defendants on the § 1983 claim against Katy ISD.  The summary judgment motion as to the § 1983 claim against Officer Paley is denied because

there are genuine factual disputes material to determining if a reasonable officer in Officer Paley's position would have used the amount or type of force he used.

SIGNED on June 5, 2019, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge